No. 24-4835

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NOVALPINA CAPITAL PARTNERS I GP S.A.R.L.,

*Petitioner-Appellee,*

v.

TOBIAS READ AND MICHAEL LANGDON,

*Respondents,*

and

TREO ASSET MANAGEMENT LLC AND TREO NOAL GP SARL,

*Intervenor-Appellants.*

On appeal from the
United States district court for the District of Oregon
Hon. Karin. J. Immergut
Case No. 3:23-mc-00082-IM

## INTERVENOR-APPELLANTS TREO ASSET MANAGEMENT
## LLC AND NOAL GP SARL'S FURTHER EXCERPTS OF RECORD
## VOLUME I

James Durkin
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606-0029
Tele: +1 312 984 2062
jdurkin@mwe.com

Sagar K. Ravi
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
Tele: +1 202 756 8043
sravi@mwe.com

Edward B. Diskant
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017-3852
Tele: +1 212 547 5754
ediskant@mwe.com

*Attorneys for Intervenor-Appellants*
*Treo Asset Management LLC &*
*Treo NOAL GP SARL*

## INDEX

| Document | Date Filed | USDC Dkt. No. | FER No. |
|---|---|---|---|
| Motion to Compel Tobias Read and Michael Langdon to Produce Non-Privileged Documents | 01/29/2025 | 73 | 3-18 |
| Petitioner's Opposition to Motion to Stay Pending Appeal | 08/09/2024 | 69 | 19-34 |

Jesse Mondry, OSB #192559
Harris Bricken Sliwoski, LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harrisbricken.com

Tara J. Plochocki (DC Bar 989404)
Sequor Law
650 Massachusetts Avenue N.W.
Suite 600
Washington, DC 20001
tplochocki@sequorlaw.com

*Counsel for Petitioner Novalpina Capital Partners I GP S.À.R.L.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **IN RE PETITION OF NOVALPINA CAPITAL PARTNERS I GP S.À.R.L. FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** | **Case No.  3:23-mc-82-IM**<br><br>**MOTION TO COMPEL TOBIAS READ AND MICHAEL LANGDON TO PRODUCE NON-PRIVILEGED DOCUMENTS** |

## INTRODUCTION

Petitioner Novalpina GP ("Petitioner") files this Motion to Compel Tobias Read and Michael Langdon ("Respondents") of the State of Oregon's Department of the Treasury to comply with this Court's Order of August 10, 2023, which authorized the issuance of subpoenas to Respondents pursuant to 28 U.S.C. § 1782.  In this motion, Petitioner requests this Court to order production of documents improperly designated privileged.

The improperly withheld documents pertain to a coordinated effort among the limited partners of a private equity fund to achieve a commercially favorable outcome in the context of replacing the fund's leadership.  This does not give rise to privilege.  Respondents make sweeping

claims of privilege over communications exchanged at a time when the limited partners did not face any liability or legal conflict of any kind; certain limited partners' choice to sometimes involve a lawyer—who explicitly did not represent Mr. Langdon/Oregon--was precipitated by a mere common financial interest in protecting their investments. And the lack of involvement by any counsel for Respondents in the overwhelming majority of the allegedly privileged communications underscores the point that there was no joint *legal* strategy, only a commercially astute one.

That the Limited Partner Advisory Committee ("LPAC"), led by Langdon, decided to breach the Limited Partnership Agreement in or around July or August 2021, resulting in a February 2022 lawsuit, does not retroactively make *prior* communications privileged. Accordingly, Petitioner requests this Court to either order production of these documents outright or to review the subject materials as appropriate and order the production of documents on an individual basis.

## LOCAL RULE 7.1(a) COMPLIANCE

Pursuant to Local Rule 7.1(a), counsel for Novalpina Capital Partners GP S.à.r.l. ("Novalpina GP") conferred via email with counsel for Mssrs. Langdon and Read regarding this motion and the parties were unable to resolve their dispute.

## RELEVANT FACTUAL BACKGROUND

This dispute concerns NOAL SCSp, originally known as Novalpina Capital Partners I SCSp (the "Fund"), a private equity fund once meticulously governed by Petitioner as general partner. *See* ECF No. 6, Declaration of Nicolas Thieltgen ("Thieltgen Decl."), ¶ 10. The Fund was set up by the Petitioner and entities indirectly held by Stefan Kowski, Bastian Lueken, and Stephen Peel (collectively, the "Founders"), who each held one-third of the shares of the ultimate parent corporation of Petitioner. *Id.* ¶ 10. The three founders of the Fund managed Novalpina Capital

LLP and Novalpina Capital Management International LLP (together, the "Investment Advisors"). The Investment Advisors issued investment recommendations to the Fund's Alternative Investment Fund Manager ("AIFM"), LIS Sanne S.A. *Id.* ¶ 10.  The Fund included investments from some 70 additional Limited Partners. *Id.* ¶ 13.

The Fund was governed by a Limited Partnership Agreement ("LPA"). *Id.* ¶ 25. Among the provisions of the LPA was a clause governing a "no fault divorce", whereby the general partner could be removed without cause, subject to a duty to be paid (i) the Removal Entitlement upon sale of assets; (ii) the Sponsor Commitment prior to its replacement; and (iii) the Priority Profit Share (collectively, the "No-Fault Divorce Entitlements"). *Id.* The amount owed would be based on the value of the Fund as of the date of removal; this was to be determined by an independent valuer appointed by the outgoing general partner with approval of the Limited Partners. *Id.* ¶¶ 25, 35. Additionally, the LPA had terms that called for the automatic termination of the Fund under certain conditions, including the failure to appoint a replacement general partner within 20 business days of removal, which was extended to 35 days after removal by Novalpina to keep the fund from terminating and in the interest of the LPs. *Id.* ¶ 38; *see also* Declaration of Tara J. Plochocki ("TJP Decl."), ¶ 2, Ex. 1.

In or around November 2020, Stephen Peel devised a plan to wrest control of the Fund and its proceeds from the entities co-owned by his partners. Thieltgen Decl. ¶ 18.  To gain leverage, he began blocking important investment and management decisions at the level of the Investment Advisors to create chaos, resulting in the eventual partial suspension of his voting rights in January 2021 by the other two Founders and four independent directors (a chain of events known as the "Founders' Dispute"). *Id.* ¶¶ 19, 20, 22.

In December 2020, Peel recruited a crucial ally, Michael Langdon, the Director of Private Markets in the Oregon State Treasury Investment Division; he recommends investments in private equity to be made on behalf of the Oregon Public Employees Retirement Fund ("OPERF"). *Id*. ¶¶ 21, 4. OPERF was the largest investor in the Fund, with a capital commitment of €200 million. *Id*. ¶ 5. Langdon also held considerable power as the Chairman of the LPAC. *Id*. ¶ 5. During the Founders' Dispute, Langdon served as the go-between for the Founders—particularly Peel—and the other Limited Partners via the LPAC.

The Limited Partners were concerned about the potential impact of the Founders' Dispute on their investment and sought legal counsel.  One Limited Partner noted that ████████████ ████████████████████████████████████████████████████████████ ████████████████ TJP Decl. ¶ 3, Ex. 2. Eight out of the ten members of the LPAC then retained Proskauer Rose (UK) LLP ("Proskauer Rose") in or around March of 2021, partially funded by Peel. *See* TJP Decl. ¶ 4, Ex. 3; Thieltgen Decl. ¶ 39. OPERF was not among them; █ ████████████████████████████████████████████████████████████ ████████████████ *See* TJP Decl. ¶ 5, Ex. 4.

Still, the LPAC's options were limited as the No-Fault Divorce Entitlements would likely constitute a substantial sum in the hundreds of millions of euros. *Id*. ¶ 25.  Peel proposed to the LPAC that they should remove Novalpina GP without cause and install an entity solely owned by him as replacement general partner of the fund. *Id*. ¶ 27.  If they did, he would: (1) fund the cost of the LPAC's lawyers; (2) find a way around the No-Fault Divorce Entitlements in the LPA; (3) reduce the Fund's management fees payable if they appointed him as the general partner; and (4) indemnify the LPAC limited partners for any costs and liabilities they would suffer due to Peel's breaches of his duties to Novalpina. *Id*. The LPAC proceeded with Peel's proposal. *Id*. ¶¶ 27, 35.

From April through June 2021, Langdon then engaged in direct discussions with Peel and his affiliates to attempt to install Peel as general partner. *Id.* ¶ 32. Langdon even attempted to mediate with the other Founders on Peel's behalf, suggesting Peel should have "sole governance of the Fund". TJP Decl. ¶ 6, Ex. 5.

However, some limited partners were not convinced that Peel would be the best option for a new manager and the possible termination of the Fund should they fail to appoint a replacement general partner (e.g. because Peel would be enjoined by courts in the U.K. or Luxembourg from taking on the role he proposed). *See* TJP Decl. ¶ 7, Ex. 6. In June 2021, the LPAC solicited alternatives for general partner: including an entity affiliated with Berkeley Research Group at the time, BRG Asset Management LLC, now known as Treo Asset Management LLC ("Treo"). *See* TJP Decl. ¶ 8, Ex. 7. Of concern was what the No-Fault Divorce Entitlements would cost. *See* TJP Decl. ¶ 9, Ex. 8 ████████████████████████████████████████ ████████████████████████████████████████████ As it would turn out, this estimate was wildly below the real value.

The LPAC exercised their rights under the LPA and voted on July 9, 2021 to remove Petitioner as general partner without cause. Thieltgen Decl., ¶ 35. Not long after, a valuation conducted by Ernst & Young in the ordinary course of business as of June 30, 2021, revealed that the Fund had indeed grown under Petitioner's guidance, which would make the No-Fault Divorce Entitlements worth hundreds of millions of euros, far exceeding the LPAC's estimates. TJP Decl. ¶ 10, Ex. 9. Eventually, in August 2021, the LPAC nominated and confirmed an entity associated with Treo—BRG NOAL GP S.a.r.l. ("NOAL GP")—as the replacement general partner, subject to the valuation being carried out and payment of the No-Fault Divorce Entitlements being made. Thieltgen Decl. ¶ 41.

To induce the Founders and Novalpina entites to facilitate the transition, NOAL GP and the LPAC agreed to valuation principles and to appoint an independent valuer after NOAL GP would take up is position. *Id.* ¶ 42. However, the independent valuer was never appointed, as the LPAC was unwilling to appoint any valuer purporting that a valuation on the basis that the LPAC and NOAL GP claimed that such valuation had always been "infeasible," despite promises to the contrary. *Id.* ¶ 44. To date, NOAL GP remains general partner of the Fund, the independent valuation was never conducted, and the payments to which Petitioner is entitled under the LPA have not been made.

## PROCEDURAL BACKGROUND

On August 10, 2023, this Court granted Petitioner's Petition for Judicial Assistance pursuant to 28 U.S.C. § 1782. ECF No. 32. Respondents, however, did not adequately comply with the Court's order at that time and insisted compliance would only occur after issues related to a prior stipulated order were resolved. *See* ECF No. 38, at 3; ECF No. 64, at 4. This non-compliance resulted in Petitioner's first Motion to Compel. ECF No. 38. This Court granted that Motion on July 30, 2024. ECF No. 64.

On August 30, 2024, Respondents produced the remaining documents and communications, as well as a privilege log detailing the documents and communications that were not produced, a copy of which is included as **Exhibit 10** (the "Privilege Log"). TJP Decl. ¶ 11, Ex. 10. The Privilege Log—nearly 200 pages long—describes some 2,030 emails and documents that Respondents refuses to produce on the basis of either the attorney-client privilege or the attorney work-product doctrine. Petitioner conferred with Respondents' counsel in a letter dated October 10, 2024, a copy of which is attached as **Exhibit 11**, regarding several issues with the Log. In that letter, Petitioner requested Respondents to identify counsel for OPERF/Langdon. TJP Decl. ¶ 12,

Ex. 11, at 1. Petitioner also contested the application of privilege to communications with Proskauer Rose and other non-attorney entities, it understood that Proskauer Rose represented the LPAC but not OPERF. *Id*. at 1–2. Finally, Petitioner requested a redaction log regarding materials that were produced but redacted. *Id*. at 3.

Respondents responded to the substantive arguments in an email dated October 17, 2024, attached as **<u>Exhibit 12</u>**. TJP Decl. ¶ 13, Ex. 12. In their email of October 17, 2024, Respondents confirmed that OPERF had been represented by in-house counsel at the Oregon Department of Justice and outside-counsel Morgan, Lewis & Bockius LLP ("Morgan Lewis") in London, and did not dispute that Proskauer Rose did not represent OPERF. TJP Decl. ¶ 13, Ex. 12, at 1. Respondents also contended that communications with other attorneys and third parties that do not represent OPERF were covered by the common-interest doctrine, as those entities allegedly shared a common legal interest with OPERF. Respondents did not elaborate as to the nature or timeframe of the legal interest or interests that established the common interest.

The Privilege Log has problems. For instance, of the 2,030 total documents and communications for which Respondents claim privilege, Morgan Lewis or OPERF's in-house counsel only appear on a combined 427 entries (constituting less than a quarter of the total communications). In fact, the vast majority of communications in the Log are directed to Proskauer Rose, who represented only the eight members of the LPAC who retained them and not OPERF. OPERF's counsel does not appear to have been working with the LPAC's counsel; there are only 50 emails total with both Morgan Lewis and Proskauer Rose, and only seven emails in which both OPERF's in-house counsel and Proskauer Rose both appear. *See* TJP Decl. ¶ 11, Ex. 10. A grand total of only two emails include all three entities (OPERF's in-house counsel, Morgan Lewis, and Proskauer Rose) on the same email chain. The Log further lists 172 other emails—purportedly

subject to attorney-client privilege—between Langdon and various third parties on which *no attorney for any party* is copied or included. **Exhibit 13** provides a matrix of these 172 entries. TJP Decl. ¶ 14, Ex. 13.

**ARGUMENT**

The attorney-client privilege should "be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). The assertions of privilege made here are well outside those narrowest possible limits. There are two broad categories of documents and communications which lack indicia of privilege. First, communications between Langdon and various third parties for which attorney-client privilege is asserted but which—crucially—do not involve any attorneys. Second, there are hundreds of communications between Langdon and Proskauer Rose. The absence of counsel for Oregon on all but a few dozen communications suggests that this was not a case of separate attorneys coordinating a joint legal strategy for their respective clients, but rather an unrepresented party making commercial, not legal, decisions in concert with other limited partners and *their* counsel at a time when there was no conceivable reason for the LPAC to be preparing litigation or a defense thereto. As such, the Court should either order production or conduct an *in camera* review to ensure the privilege has been invoked with the requisite precision.

### A. Legal Standards

### 1. The Attorney-Client Privilege & Work Product Protection

An eight-part test governs attorney-client privilege determinations in this Circuit: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived. *Ruehle*, 583 F.3d at 607. The privilege protects only the

communications, and not underlying facts. *Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981). The party asserting the privilege bears the burden of proving the attorney-client relationship and the privileged nature of the communications. *Rodriguez v. Seabreeze Jetlev LLC*, 620 F. Supp. 3d 1009, 1019 (N.D. Cal. 2022) (citing *Ruehle*, 583 F.3d at 607)).

"To qualify for work-product protection, materials must '(1) be prepared in anticipation of litigation or for trial and (2) be prepared by or for another party or by or for that other party's representative.'" *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 863 (N.D. Cal. 2019) (citation omitted).). The work-product doctrine "protects non-opinion work product under a substantial need/undue hardship test and affords near absolute protection to opinion work-product." *Seabreeze Jetley*, 620 F. Supp. 3d. at 1021 (citation omitted).

### 2. The Common-Interest Doctrine

The common-interest doctrine serves as an exception to "ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *Seabreeze Jetlev*, 620 F. Supp. 3d at 1019; *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other"). It applies only to communications that are privileged in the first instance. *Seabreeze Jetley*, 620 F. Supp. 3d at 1019. The common-interest doctrine exists so that attorneys for separate clients may coordinate their strategies without destroying the privileged status of their communications. Restatement (Third) of the Law Governing Lawyers § 76, (Am. L. Inst. 2000), cmt. *b*; *see also In re Grand Jury*, 23 F.4th at 1092.

"However, a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. More specifically, "[t]he parties . . . must have 'a common legal, as opposed to commercial, interest'" *Seabreeze Jetley*, 620 F. Supp. 3d at 1019 (citing *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007)) "[T]he parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *In re Pac. Pictures Corp.*, 679 F.3d at 1129 (citation omitted). Additionally,

> Because the common-interest privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as *apost* [sic] *hoc* justification for a client's impermissible disclosures. The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when *attorneys*, not client, decide to share information in order to coordinate legal strategies.

*SEC v. Aequitas Mgmt., LLC*, No. 3:16-CV-438-PK, 2017 U.S. Dist. LEXIS 208413, at *17 (D. Or. July 7, 2017). While the Ninth Circuit has never addressed whether communications directly between clients without a lawyer present defeats the privilege, the Second Circuit test is whether the "communication [is] made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*." *United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017) (citing *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)) (emphasis in original).

## B. Respondents' Privilege Log Contains Non-Privileged Documents

### 1. 172 Emails With No Attorney Present Are Not Protected by the Attorney-Client Privilege

None of the 172 communications provided in Exhibit 13 are privileged in the first instance under the test provided by the Ninth Circuit.  First, the emails are sent between non-attorney third parties. But, second, non-lawyers/clients do not seek *legal advice* from other non-attorneys/clients. Third, the emails are not sent to *any* attorneys, nor are any attorneys copied on the emails.

Therefore, the communications identified in Exhibit 13 are not communications seeking or providing legal advice from a professional legal advisor in confidence, they fail to qualify for the protection of the attorney-client privilege. *See Upjohn*, 449 U.S. at 389 ("'The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.'" (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)); *In re Grand Jury*, 23 F.4th at 1091 ("'The attorney-client privilege protects communications between attorneys and clients, which are made for the purpose of giving legal advice.'" (quoting *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 1954)); *see also Ruehle*, 583 F.3d at 607, supra at 8 (discussing the eight part test for determining whether attorney-client privilege applies: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived).

Reference Number 450 of the Privilege Log illustrates the problem. TJP Decl. ¶ 14, Ex. 13. This is an email between three individuals—Langdon, Rohit Kapur of Centrica PLC ("Kapur"), and Benoit Robertz of Compagnie Nationale a Portefeuille S.A. ("Robertz")—dated April 28, 2021, with a subject line of "RE: EXT Novalpina - latest from SK - instructions needed". According to the Privilege Log, this email is privileged as it is an "Email to Proskauer requesting legal advice re: proposals to resolve founders' dispute and Lux proceedings." *Id*. But this is facially untrue. None of the individuals on the cited email chain are from Proskauer, so it's not a request to Proskauer for anything. Nor is it a request to any attorney; the individuals on the cited email chain are limited partners/investors, not lawyers.

The same problem exists for approximately seventy other emails between only Mssrs. Kapur, Robertz, and Langdon over which attorney-client privilege is asserted but no attorney is listed. *See, e.g.*, TJP Decl., ¶ 14, Ex. 13, Ref. No. 1647. There are also dozens of bilateral communications between Langdon and Kapur or Langdon and Robertz for which attorney-client privilege is also asserted but an attorney is nowhere to be found. *See, e.g.,* TJP Decl. ¶ 14, Ex. 13, Ref. No. 1586. Because these emails are not privileged in the first instance, they cannot be swept into the ambit of the common interest doctrine. To hold otherwise would be afford attorney-client privilege to communications between parties whenever they are aligned against a common adversary.

To the extent Respondents protest that the communications are about legal advice, Petitioner requests the Court to conduct in camera review to ensure that Mr. Langdon is not invoking the attorney-client privilege to conceal communications with Mr. Kapur, Robertz, and later, Treo, about an intent to breach their contract by not paying Petitioner the No-Fault Divorce Entitlements or by adopting Peel's proposal, rather than a group of non-lawyers communicating with each other in order to seek legal advice. The possibility of an improperly broad assertion of privilege is real. Other non-privileged communications established that the LPAC—as ten of the largest investors—did not want to pay the No-Fault Divorce Entitlements and entertained proposals from Stephen Peel to take over the fund. TJP Decl. ¶ 15, Ex. 14. These were issues of serious relevance to their investments and are quintessentially commercial. While there was litigation then pending, it was exclusively between the Founders and concerned intra-shareholder voting rights; it had nothing to do with the legal interests of the LPAC. Litigation against the LPAC was not commenced until the next year, in February 2022.

Of the 172 "privileged" emails between LPAC members, 135 predate the removal of Novalpina GP as general partner; another 21 days between mid-July 2021 and late October 2021, when, again, the only litigation was intra-Novalpina disputes. Accordingly, this may be an instance where, like in *Aequitas Management*, 2017 U.S. Dist. LEXIS 208413, at *17, after in camera review, the court found that emails were not circulated between counsel for the respective parties— there, corporate entities and individual defendants—and thus were not privileged. In so ruling, the court observed that a common commercial interest does not create privilege, nor does the desire to see the same outcome of litigation. *Id.* Likewise, legal interests must be identical and emails concerning the retention of attorneys and their arrangements are not privileged. *Id.* at *20 n.1.

### 2. 172 Emails With No Attorney Present Do Not Appear to Contain Attorney Work Product

Respondents also claim privilege under the work-product doctrine in the 172 emails where no attorney is present. *See generally* TJP Decl. ¶ 14, Ex. 13. This should not be taken at face value; the Privilege Log does not delineate between non-privileged non-opinion work product and privileged opinion work product, generally indicating only that the communication "reflect[s] legal advice" in a blanket claim of privilege. *See, e.g.*, *Id.*, Ref. No. 1078. To the extent these communications contain non-opinion work product, they should be produced.

The work product privilege does not seem applicable here. For instance, it is used to reference emails *to* counsel. Privilege Log Reference Number 450, for which work product privilege is invoked, is described as an "Email to Proskauer requesting legal advice re: proposals to resolve founders' dispute and Lux proceedings", which not only does not copy anyone from Proskauer, but makes no reference to any work product, like a memorandum or draft of some kind. *Id.* Ref. No. 140. This description is insufficient to justify the privilege claimed.

### D. The Common-Interest Doctrine Does Not Protect Communications With Proskauer Rose

From the outset, Proskauer Rose and OPERF expressly agreed that they did not have an attorney-client relationship. *See* TJP Decl. ¶ 5, Ex. 4. The only way communications between Oregon and Proskauer could be privileged is if the common-interest doctrine applies, which it does not here.

The common-interest doctrine protects communications made in connection with a common legal, as opposed to solely commercial, interest. *Seabreeze Jetley*, 620 F. Supp. 3d. at 1019. As discussed above, the common interest doctrine exists only to allow coordination of a joint strategy between the attorneys for clients with a common legal interest. Restatement (Third) of the Law Governing Lawyers § 76; *Aequitas Mgmt., LLC*, 2017 U.S. Dist. LEXIS 208413, at *17. Here, communications between the represented LPAC members when they retained Proskauer Rose in January 2021 establish that the interest in retaining an LPAC counsel was commercial at its core. *See* TJP Decl. ¶ 3, Ex. 2 ██████████████████████████

██████████████████████████████████████████████

Whether or to what extent a common legal interest materialized before the lawsuit filed by Petitioner in February 2022 is unclear, but even Respondents concede that "the dispute among the founders threatened the LPs' investments" and this precipitated the retention of counsel by the LPAC. *Id.* ¶ 13, Ex. 12. Respondents state that the dispute had "legal implications" and thus the LPAC shared a "common legal interest," (*id.*), but so stating does not create such an interest.

There are no magic words that can create a common interest privilege where it does not legally apply and has not been executed in a manner that preserves the privilege, to the extent it ever existed. Although Respondents claim that they could not hire Proskauer in London because of limitations on the state hiring outside counsel, Respondents are represented by outside counsel in this matter, and also retained counsel in Morgan Lewis's London office. *Id.*, Ex. 12; *see also id.* ¶ 11, Ex. 10. Whatever restrictions foreclosed the hiring of Proskauer but allowed the hiring

of Morgan Lewis surely did not restrict Morgan Lewis's ability to coordinate a legal strategy with the former. And yet OPERF's in-house counsel, OPERF's UK counsel Morgan Lewis, and Proskauer Rose were only included as a group in *two* emails out of the two thousand over which privilege is claimed. *See generally* TJP Decl. ¶ 11, Ex. 10.

The purpose of the common-interest privilege is to allow "persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers" so that "the separate lawyers representing them may exchange confidential communications to prepare their [case] without loss of the privilege." Restatement (Third) of the Law Governing Lawyers § 76, cmt. *b*. OPERF's certification of non-waiver, executed February 18, 2021, by the Chief Investment Officer, purports to acknowledge a "common interest" with members of the LPAC that retained Proskauer, but says nothing about its own legal counsel, which was then left off of nearly all communications between Langdon and Proskauer. Whatever was being coordinated between the LPAC and its counsel, and Oregon sans counsel, is unlikely to have been the joint preparation of a claim or defense to one. The Court should examine these documents to ensure that the common interest doctrine has not been misapplied here.

## CONCLUSION

For the reasons set forth above, Petitioner respectfully requests the Court to grant this Motion to Compel or, in the alternative, review the documents *in camera* to determine whether information in the materials is not privileged, and award costs. To the extent it determines that Respondents Read and Langdon withheld relevant communications and documents that are plainly not privileged, the Court should award costs to Petitioner.

DATED this 29th day of January 2025.

By: s/ Tara J. Plochocki

Jesse Mondry, OSB #192559
Harris Bricken Sliwoski, LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harrisbricken.com

Tara J. Plochocki (DC Bar 989404)
Sequor Law
650 Massachusetts Avenue N.W.
Suite 600
Washington, DC 20001
tplochocki@sequorlaw.com

*Counsel for Petitioner Novalpina Capital
Partners I GP S.À.R.L.*

Jesse Mondry, OSB #192559
Harris Sliwoski LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harris-sliwoski.com

Tara J. Plochocki, DCB #989404
Sequor Law P.A.
650 Massachusetts Avenue NW
Suite 600
Washington, DC  20001
tplochocki@sequorlaw.com

*Counsel for Petitioner Novalpina Capital Partners I GP S.À.R.L.*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| IN RE PETITION OF NOVALPINA CAPITAL PARTNERS I GP S.À.R.L. FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No.  3:23-mc-82-IM<br><br>**PETITIONER'S OPPOSITION TO MOTION TO STAY PENDING APPEAL** |

Intervenors Treo Asset Management LLC and Treo NOAL GP (together, "Intervenors")

have appealed the July 30, 2024, order granting Petitioner Novalpina Capital Partners I GP

S.À.R.L's (Novalpina") motion to compel Michael Langdon and Tobias Reed, government

officials from the Department of Treasury of the State of Oregon ("Respondents") to comply with

subpoenas issued pursuant to 28 U.S.C. § 1782. D.E. 64 (the "Order"). The Order also denied

Intervenors' motion for reconsideration of the grant of the § 1782 petition or, in the alternative, to

amend the protective order between Novalpina and Respondents. On August 2, 2024, Intervenors

PETITIONER'S OPPOSITION TO MOTION TO STAY - 1

filed a motion to stay the Order pending appeal, D.E. 65 (the "Motion"). Novalpina opposes the Motion and states as follows:

## INTRODUCTION

Intervenors seek to force the District Court to rewrite the order granting the § 1782 Petition to impose unwarranted restrictions that it neglected to timely seek in its original opposition. They also seek to override a Protective Order which Respondents—the only ones with production obligations—moved the Court to enter and which Intervenors did not oppose in the three weeks before the Court granted it. *Compare* Stipulated Motion for Protective Order, D.E. 33 (Jan. 24, 2024) *and* Order, D.E. 36 (Feb. 13, 2024) (granting unopposed motion for protective order). Intervenors were never entitled to any of the relief sought, and the Court should not grant a stay of production pending Intervenors' continuing attempt to raise untimely challenge the Court's orders. The appealed Order fully lays out the procedural, legal, and factual justifications for its denial of Intervenors' motion for reconsideration or to amend the Protective Order, and Intervenors do not even attempt to explain how the Ninth Circuit could find that this Court abused its discretion in so ruling.

Intervenors' Motion fails to adduce evidence satisfying any of the four factors the Court must consider before granting a stay. In fact, the record in this case demonstrates that each factor weighs heavily in favor of denying a stay.  First, the Motion fails to establish that Intervenors will be able to present a substantial case for relief on appeal because it does not identify any abuse of discretion in the challenged Order (or even mention the abuse of discretion standard at all), much less a strong likelihood that the Ninth Circuit will find an abuse, reverse the District Curt's factual findings, and remand with instructions to make a different factual finding on the evidence of alleged chicanery.  The appeal is a Hail Mary at best.

PETITIONER'S OPPOSITION TO MOTION TO STAY - 2

Second, the Motion, unaccompanied by any affidavit or factual proffer, fails to adduce any evidence of the harm that will befall without a stay, to say nothing of *irreparable* harm. The disclosure of relevant, non-privileged documents subject to a protective order is simply not comparable to the cases dealing with the public disclosure of business secrets, private personal information, or privileged materials that could justify a stay of disclosure.

The third factor, balance of harms, heavily weighs against a stay as Novalpina has still been unable to obtain full discovery 20 months after it first filed its petition. Intervenors' failed motions practice and appeal have driven up the cost of what should be straightforward disclosure of a limited universe of documents. Petitioner should not be made to bear many more months of burden to obtain the relief awarded a year ago.

Fourth and finally, Congress created Section 1782 to display the benefits of the efficient and effective discovery procedures in U.S. courts to foreign courts and litigants. Enabling an aggressive intervenor to obstruct third-party discovery would hardly support the public interest in efficient disclosure.

The Court should deny the Motion for a Stay Pending Appeal.

## ARGUMENT

In determining whether to grant a stay pending appeal, a court must consider 1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits"; 2) the likelihood the "applicant will be irreparably injured absent a stay"; 3) "whether issuance of the stay will substantially injure" other interested parties; and 4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "[B]ecause the burden of meeting the standard is a heavy one, more commonly stay [pending appeal] requests will be found not to meet this standard and will be

denied." WRIGHT & MILLER, 11 FED. PRAC. & PROC. CIV. § 2904 (3d ed.). If a movant fails to

carry its burden on the first two factors, it is unnecessary to address the remaining two factors.

*Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co*., No. 3:16-CV-00495-HZ, 2016 WL 9226389, at

*3 (D. Or. Oct. 5, 2016) (denying stay).

### A. Intervenors Are Not Entitled to a Stay Because They Cannot Prevail on the Merits.

A party seeking a stay pending their appeal must show that their claim is "likely to succeed

on the merits." *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (stating factors for a stay pending

appeal). Although a movant "need not demonstrate that it is more likely than not that they will

win on the merits," it must nevertheless demonstrate a "reasonable probability," a "fair prospect,"

"a substantial case on the merits," or that "serious legal questions are raised." *Leiva-Perez v.

Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (citing to various formulations).

Intervenors appeal from the denial of their motion for reconsideration or to modify a

protective order.[1] Notice of Appeal, D.E. 66. An appeal of a denial of reconsideration is reviewed

for abuse of discretion. *United States v. Gonzalez*, No. 23-634, 2024 U.S. App. LEXIS 4219, at *1

(9th Cir. Feb. 21, 2024) ("Rulings on reconsideration motions are reviewed for abuse of

discretion.") (cleaned up). Similarly, a denial of a modification of a protective order is reviewed

for abuse of discretion. *Blum v. Merrill Lynch Pierce Fenner & Smith Inc*., 712 F.3d 1349, 1352

(9th Cir. 2013) ("We also review a district court's decision to modify its protective order for abuse

of discretion."). Therefore, Intervenors' appeal will be subject to an abuse of discretion standard.

---

[1] Intervenor's Notice of Appeal apparently also purports to appeal both the Order's denial of
Respondent's cross-motion to amend the protective order and the grant of Novalpina's motion to
compel. Notice of Appeal, D.E. 66 at 2. However, Intervenors lack standing to appeal these
aspects of the Order because they can neither speak for Respondents nor attack a motion to compel
to which they never filed an opposition. *See K.C. v. Shipman*, 716 F.3d 107, 116–117 (4th Cir.
2013) (defendant lacked standing to appeal injunction as to co-defendant); *cf. Berg v. Popham,* 412
F.3d 1122, 1130 (9th Cir. 2005) (circuit court lacked jurisdiction over parties' appeal of order
imposing sanctions against their attorney).

"[A]buse of discretion review means [the Ninth Circuit] will not reverse unless 'the district court reaches a result that is illogical, implausible, or without support in inferences that may be drawn from the record.'" *Schoenberg v. Fed. Bureau of Investigation*, 2 F.4th 1270, 1275 (9th Cir. 2021).

### 1.  Intervenors Fail Even to Argue That the Court Abused Its Discretion.

Intervenors argue that their appeal will raise "serious legal questions" satisfying the first factor because "the Ninth Circuit does not appear to have squarely addressed" the "central" finding that a party may use documents obtained via a § 1782 petition for matters other than the originally identified foreign proceeding. Mot. at 6. They also argue that "the lack of precedent from the Ninth Circuit on the sort of conduct that constitutes 'chicanery' warranting reconsideration or narrowing of a Section 1782 Petition" inherently creates a strong chance of success on appeal.  Mot. at 5.  Yet Intervenors fail to explain any likelihood that the Ninth Circuit would choose to disregard the unanimous and well-reasoned opinions of sister circuits to create a circuit split, much less how the record in this case would lead to such a result. *See* Order at 7-8 (citing precedents from the 2nd and 11th Circuits). "[A]lthough the absence of controlling precedent is one factor for the district court to consider in determining whether a question is 'substantial,' it is not the only factor. Indeed, 'there might be no precedent in this circuit, but there may also be no real reason to believe that this circuit would depart from unanimous resolution of the issue by other circuits.'" *United States v. Reed*, No. 15-100, 2017 U.S. Dist. LEXIS 33723, at *5-6 (E.D. La. Mar. 9, 2017) (citing persuasive 3rd Circuit precedent).

Fatally, the Motion provides no argument whatsoever as to why the Court's abused its discretion in concluding that its previous orders did not bar Novalpina from using the documents obtained in other proceedings. Indeed, the Court made no error. The Court pointed out that there

was no dispute that the order granting the § 1782 petition "did not limit the use of materials to the two proceedings identified by Petitioner, and neither Respondents nor Intervenors requested such a limitation in their oppositions."  Order at 8.  The Court noted that Respondents' stipulation to the "unambiguous" Protective Order that "plainly allows for the use of materials beyond the two proceedings" confirmed the scope of the original order.  *Id.*  The Court set out the procedural history of how the protective order came to be, noting that it was on the docket some weeks before it was entered. *Id.* at 3. There is no error in the Court's conclusion that Respondents should be held to their agreement. *Id.* The Court's statement that it "does not find that Intervenors and Respondents provided evidence of 'chicanery'"—which is a factual finding—speaks for itself: using documents in a manner not precluded by the Court's original Order and negotiating a post-judgment protective order at arm's length is not chicanery. *Id.* The lack of a Ninth Circuit precedent defining "chicanery" in no way implies even a small likelihood that the Ninth Circuit would overturn the Court's factual finding.

Intervenors next argue that the Court neglected "to address *at all* the impact of the Protective Order on" Intervenors. Mot. at 6 (emphasis in original). But there was nothing for the Court to address.  Nowhere in the Motion or the supporting declarations did Intervenors articulate how the use of the documents produced by Respondents in other foreign legal proceedings would harm Intervenors.  The Motion does not dispute that Novalpina has complied with the terms of the Protective Order. Tacitly conceding its failure to adduce any evidence of "the impact of the Protective Order," Intervenors complain that the Court did not "afford[ it] the opportunity to adduce further evidence" on purported chicanery. Mot. at 6.  But there is no question that Intervenors had a full and fair opportunity to present their case in their motion to modify the protective order.  Intervenors cite no rule that would allow them to iteratively change their

arguments and present new evidence at their whim—costing all parties time and money—until it gets the result it wants.

Intervenors argue that, because "this Court has already found that Respondents were 'substantially justified' in declining to produce," Intervenors are somehow excused from their burden to show that their appeal will pose "the sort of serious legal questions' and demonstrate the sort of 'substantial case for relief' warranting a stay pending appeal." Mot. at 6. This argument superficially conflates the meanings of the terms "substantially justified" with "substantial case for relief" merely because they both contain the word "substantial."  This Court's ruling that Respondents were "substantially justified" in temporarily withholding discovery was in the context of whether to make Respondents pay for Petitioner's Motion to Compel under Federal Rule of Civil Procedure 37(a)(5)(A)(ii).  Order at 7.  The phrase "substantially justified" does not mean "'justified to a high degree,' but rather has been said to be satisfied if there is a 'genuine dispute,' or 'if reasonable people could differ as to [the appropriateness of the contested action.]'" *Lee v. Walters*, 172 F.R.D. 421, 425 (D. Or. 1997) (citing *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  Conversely, a "substantial case on the merits" means a "reasonable probability" of prevailing, which, for example, the Ninth Circuit articulated in the context of an alien seeking a stay of a removal order to a country where he had shown he would be tortured and thus entitled to stay in the U.S.  *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011).  There is no such probability here, where Intervenors must show a reasonable probability that the Ninth Circuit will find that the District Court abused its discretion in applying its own orders, one of which was impliedly and expressly consented to by all parties.

Nor does the Motion raise any "serious legal questions" in the sense of novel issues or issues affecting a large number of cases.  Not that high stakes would necessarily satisfy the first

factor, anyway. In *Mount Graham Coal. v. Thomas*, the Ninth Circuit denied a motion for a stay where the appellants challenged Congress's very ability to pass certain kinds of laws on broad separation of powers principles because existing caselaw demonstrated that the claim was unlikely to succeed. 89 F.3d 554, 558 (9th Cir. 1996), *as amended* (July 23, 1996) (holding that appellant could not dispute that Congress had the power to make the contested change to the law at issue). Intervenors must concede that the Court's order granting the § 1782 petition placed no restrictions on the use of the documents, that the Court is allowed to construe the scope of its own orders, that Respondents voluntarily entered the Protective Order, and Intervenors had a chance to object. There is no serious legal question raised on these indisputable facts.

### 2. The Underlying Motion Identifies No Newly Discovered Evidence.

Aside from the fact that the appealed Order was entirely proper, Intervenors' appeal will fail because the Ninth Circuit will see this Motion for what it is: an impermissible, belated attempt to challenge the scope of the original Order granting the § 1782 petition. As the Court rightly pointed out, that order, issued August 10, 2023, placed no limitations on the use of the documents in other proceedings. Order at 8. Indeed, Intervenors did not seek any restrictions in its opposition or file timely post-judgment relief. Intervenors belatedly moved the Court to revise its August 10 Order to narrow the original relief granted because they waived their right to appeal that order by failing to timely file a notice of appeal, and the Ninth Circuit would lack jurisdiction to consider any challenge to it. *Caldwell v. Barnhart*, 156 F. App'x 994 (9th Cir. 2005); *Littrell v. Nicholas*, 17 F. App'x 640 (9th Cir. 2001).

Intervenors' Motion demonstrates a thinly-veiled attempt to fabricate jurisdiction to appeal the August 10 Order. Its motion for reconsideration invoked Federal Rule of Civil Procedure 60(b), which permits reconsideration of an order provided that it is based on "newly discovered

evidence." But Treo did not provide any. The only evidence Intervenors cited was that 1) Petitioner grounded its Petition on two qualifying foreign legal proceedings, and 2) that documents obtained from Respondents were used in accordance with the later negotiated Protective Order. For something to be "newly discovered evidence" cognizable on a Rule 60 motion, "the evidence must have been in existence at the time of the trial." WRIGHT & MILLER, 11 FED. PRAC. & PROC. CIV. § 2859 (3d ed.); *see also Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996 (9th Cir. 2007) (91% collapse in business after judgment did not amount to "newly discovered evidence" under Rule 60); *Shoen v. Shoen*, 933 F. Supp. 871 (D. Ariz. 1996), *aff'd*, 113 F.3d 1242 (9th Cir. 1997) (alleged statements to dismissed foreman by two jurors who remained for the entire deliberations, that the jury had "really screwed up," were not newly discovered evidence because they took place after the verdict was delivered). The lack of any newly discovered evidence was fatal to its motion for reconsideration and is fatal to Intervenors' appeal because no appellate court would find an abuse of discretion where there has been a failure to "demonstrate mistake, inadvertence, surprise, excusable neglect, [or] newly-discovered evidence" when reviewing a Rule 60(b) motion. *See, e.g., Brodheim v. Conerly*, 32 F. App'x 965 (9th Cir. 2002) (dismissing appeal of Rule 60(b) motion). Although the Motion complains that the Order got it wrong, it offers no explanation for how its underlying motion for reconsideration could ever have met the requirements of Rule 60(b). *See* Mot.

### 3. Intervenors' Challenge to the Protective Order Will Also Fail.

Intervenors' motion was no more likely to succeed in relation to the request to amend the protective order. As with the request for reconsideration, this, too, is a belated objection to the original Protective Order and seeks unjustified relief. That Intervenors did not themselves negotiate the Protective Order is irrelevant. Intervenors had ample opportunity to object to or

oppose the Order in its proposed form. As the Order states the Motion for the Protective Order was filed in January 2024. (Op. at 3). The Court rejected the motion initially and directed "the party or parties seeking protection" to re-file. D.E. 34.  Respondents filed a Motion asking the Court to enter the Protective Order on February 3.  Respondents justified the Protective Order, in part, on the basis that "TREO Asset Management, whose confidential information may be produced under the Subpoenas, has expressly requested that OPERF take steps to preserve the confidentiality of certain information that may be provided in response to the Subpoenas." D.E. 35 at 4. The Court did not grant that Motion and enter until February 13, 2024. Intervenors had *20 days* to oppose or object to the "unambiguous" proposed Protective Order. They did not.

Intervenors thus packaged their belated objections to the Protective Order as a motion to amend.  While Intervenors can certainly challenge the denial of that motion on appeal, the Ninth Circuit is bound to see, as this Court did, that the agreed Protective Order is unambiguous on its face, the time to oppose it would have been before it was granted and the parties acted in reliance on it, and there is no good cause to amend it now.  It is black letter law in this Circuit that "if a party fails to raise an objection to an issue before judgment, he or she waives the right to challenge the issue on appeal." *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1140 (9th Cir. 2002); *Slaven v. Am. Trading Transp. Co.*, 146 F.3d 1066, 1069 (9th Cir. 1998), as amended on denial of reh'g and reh'g en banc (Aug. 18, 1998).  Failures to oppose motions are treated as consent, including in this District.  *Coltman v. Carrington Mortg. Servs., LLC*, No. 3:24-CV-00368-AA, 2024 WL 2976230, at *1 (D. Or. June 13, 2024) (no relief for party that failed to oppose motion).  Thus, where a court enters an order approving a stipulation or settlement and no objections are made, a party may not challenge that settlement or order on appeal. Intervenors' only objection to the Protective Order is that Novalpina GP took actions expressly permitted by it.  Their motion to amend the protective

order was not made to a blanket protective order, nor was it animated by a need for public disclosure, as ordinarily undergirds such motions to amend. *See, e.g., Blum v. Merrill Lynch Pierce Fenner & Smith Inc*., 712 F.3d 1349, 1355 (9th Cir. 2013) (modifying blanket protective order to grant a third party access to discovery). Intervenors' motion is just an objection to Respondents' agreement that the confidential documents produced by the State of Oregon may be used by interested parties in related proceedings, and it is neither timely nor supported by good cause.

### B. Intervenors Cannot Show Injury Without a Stay, Much Less Irreparable Injury.

Intervenors' Motion fails to present evidence of any injury at all; it thus fails to satisfy the "bedrock requirement" of showing that there will be *irreparable* injury to Intervenors. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). Intervenors must independently satisfy the requirement of suffering a legally cognizable injury to have standing to appeal a district court's decision. *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 669 (2019). Without any injury alleged, Treo falls short of what is needed to show that it has standing to appeal the denial of its Motion.

Intervenors argue that "Courts routinely find irreparable injury in the context of a required document production . . . because once documents are produced, it is all but impossible to retrieve them," but make no attempt to argue that a mere document production, without more, amounts to irreparable harm. Mot. at 7. The only harm is that the documents show that Treo has been a very bad actor, (*see* Motion to Compel, Dkt. #38, pp. 1-9), and proof of this fact is not good for them. Being compelled to produce documents is not legally cognizable harm, nor is it irreparable harm. *See HRC-Hainan Holding Co., LLC v. Yihan Hu*, No. 19-mc-80277-TSH, 2020 WL 1274877, at *5 (N.D. Cal. Mar. 17, 2020) ("The mere fact that information, once disclosed, cannot be 'undisclosed' is . . . not enough by itself to warrant a finding of irreparable harm.") (internal citations omitted). If it were, then § 1782 orders would be stayed in every appeal; they are not.

PETITIONER'S OPPOSITION TO MOTION TO STAY - 11

*See id.* (denying motion for stay of discovery pending appeal of grant of § 1782 application); *see also Nikon Corp. v. GlobalFoundries United States, Inc.*, No. 17-mc-80071-BLF, 2017 U.S. Dist. LEXIS 177899, at *6 (N.D. Cal. Oct. 26, 2017) ("The burden of complying with a subpoena does not constitute irreparable injury.").

Where courts have found irreparable harm warranting a stay, the party opposing disclosure specifically identified sensitive information that was *not* subject to a protective order, and Intervenors' cases are not to the contrary. *See Maxcrest Ltd. v. United States*, 2016 WL 6599463, at *9-10 (N.D. Cal. Nov. 7, 2016) (declining to find irreparable harm even though the receiving party would be "unlikely to comply with a court order to return the summoned information should the Ninth Circuit" vacate the subpoenas, but granting stay after noting that respondent identified specific "privacy interests will be violated if the IRS obtains its Google account user information.").[2]

In any event, a stay would not cure what ails Intervenors.  Staying the Order's grant of the Motion to Compel, which requires Respondents to finish what has been started, would not redress any injury from disclosure.  Intervenors argue that a claw back of newly disclosed documents would be difficult to enforce because "foreign tribunals not obligated to follow or honor a 'claw back' directive from this Court." Mot. at 65.  But this is a red herring, not least because the Court would always retain jurisdiction over Novalpina to comply with a claw back.  More importantly, Intervenors don't explain how the disclosure of the previously disclosed documents caused any

---

[2] Intervenor's other cases do not discuss irreparable harm for the purpose of stays pending appeal, let alone in the context of Section 1782.  *See Church of Scientology of Calif. v. United States*, 506 U.S. 9, 12–13 (1992) (holding court's power to order the "Government to destroy or return any and all copies it may have in its possession" meant that taxpayer's suit over wrongfully disclosed tax records was not moot); *Hernandez v. Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010) (vacating overbroad district court order "finding an unlimited waiver of the attorney-client and work product privileges").

harm, nor how disclosing the remaining documents could amount to any harm. They do not even attempt to identify any protected information (such as business secrets, unrelated personal information, or privileged materials) that would cause some sort of harm if presented to the public. Intervenors have "not submitted a declaration or other evidence showing that these documents . . . [contain] confidential business materials or explaining how disclosure of the documents would harm [them]. Without such evidence, the Court cannot credit [Intervenors'] assertion of irreparable harm, especially given that any disclosure would be subject to the protective order issued in this case." *Nikon Corp.*, 2017 U.S. Dist. LEXIS 177899, at *6.

Intervenors omit that they are in any case protected by the Protective Order in place preventing confidential documents from public disclosure.  Not that confidentiality is a concern here—as discussed, Intervenors have not identified any information in the remaining documents to be produced that could be considered sensitive or harmful if disclosed, such as business secrets or privileged information. *Id.* at *2 (denying a stay of production obligations where a protective order was in place).

To the extent that Intervenors suggest that Respondents suffer a burden if unnecessarily compelled to produce documents, Intervenors not only lack standing to argue burden on behalf of another party, but, as discussed, mere compliance with a subpoena *per se* does not constitute irreparable injury.

## C.  The Balance of Hardships Weighs Against a Stay

Granting a stay would harm Novalpina. Petitioner filed this action 20 months ago, in January 2023.  It has been waiting for Respondents' discovery for over a year. Production has been at a standstill for the last seven months because Intervenors and Respondents manufactured a dispute over a Protective Order to which they expressly or impliedly agreed.  Petitioner has had to

PETITIONER'S OPPOSITION TO MOTION TO STAY - 13

defend itself in the Master Luxco litigation without the benefit of the discovery this Court awarded it and it is in holding pattern on its fraud claims. This is harm.

As set forth in the Motion to Compel and supporting declarations, Intervenors' strategy has been to harass the Novalpina entities and related persons by filing dozens of cases before courts and regulatory agencies. D.E. 38-41. Their goal, which they could very well meet at this rate, is to spend them into submission before the District Court of Luxembourg can vindicate Novalpina's contractual rights to the Removal Entitlement and Sponsor Commitment that Treo and Respondents refuse to pay. Intervenors are now poised to force Novalpina GP to incur the cost of a meritless appeal over a period of months before it can obtain the remainder of the nonprivileged documents.

Delay poses a significant harm to Novalpina and risks that the Petition will become moot because Intervenors' ongoing battle of attrition will drain it of both time and resources. Intervenors argue that the appeal may become moot if no stay is granted, but Novalpina's Petition may become de facto moot if the stay is granted and discovery delayed again for months. As Defendants concede, "[T]he risk of mootness by itself is sufficient to show irreparable harm." *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave.*, 2015 WL 525711, at *3 (N.D. Cal. Feb. 6, 2015); *In re Noguer*, No. 18-MC-498 (JMF), 2019 WL 1034190, at *5 (S.D.N.Y. Mar. 5, 2019) (refusing to order a stay in 1782 proceeding because of risk of mootness).

Tellingly, Intervenors admit that Novalpina would be harmed at least by the "inconvenience [of] having to await resolution of an appeal," but they fail to provide even an argument as to what security could compensate Novalpina in compliance with Fed. R. Civ. P. 62(d) (authorizing stays of non-monetary judgments "on terms for bond or other security:). Indeed, there is no way to mitigate the hardship of noncompliance with the subpoenas other than to deny

PETITIONER'S OPPOSITION TO MOTION TO STAY - 14

the motion for a stay.  *See NLRB v. Westphal*, 859 F.2d 818, 819 (9th Cir. 1988) (denying motion

to stay order compelling compliance with subpoena despite offer of a bond because "[i]t would be

difficult to calculate the size of a bond necessary to compensate the NLRB for the delay in getting

testimony and documents."); *7th Circuit Donovan v. Fall River Foundry Co*., 696 F.2d 524, 527

(7th Cir. 1982) (appealing party not entitled to stay as of right upon posting of bond in contempt

proceeding for failure to obey inspection warrant).  As such, the Court should deny the Motion.

### D.  Public Interest Favors Immediate Compliance with the Court's Order

The public interest is squarely on the side of Novalpina. § 1782 is supposed to "provid[e]

efficient assistance to participants in international litigation." *Akebia Therapeutics, Inc. v.

FibroGen, Inc*., 793 F.3d 1108, 1110 (9th Cir. 2015). "A stay on appeal of discovery orders delays

litigation, adds uncertainty to the proceedings, and increases the costs of litigation. Stays are rarely

issued, even in appeals of § 1782 proceedings." *In re Platinum Partners Value Arbitrage Fund

L.P*., No. 18CV5176 (DLC), 2018 WL 3207119, at *8 (S.D.N.Y. June 29, 2018).  Imposing such

impediments to this process is not the "example" that should be set for foreign countries, from

whom we encourage the provision of "similar assistance to our courts." *Intel Corp. v. Advanced

Micro Devices, Inc.*, 542 U.S. 241, 252 (2004).

Courts thus have routinely ruled that the public interest weighs in favor of denying stays in

Section 1782 proceedings in order to serve the "public interests in justice, fair play, and full

disclosure," "the truth in foreign actions." *In re Application of Hornbeam Corp*., No. 14-MC-424,

2017 WL 2241522, at *2 (S.D.N.Y. May 22, 2017) (internal citations omitted); *HRC-Hainan

Holding Co., LLC v. Yihan Hu*, No. 19-MC-80277-TSH, 2020 WL 1274877, at *6 (N.D. Cal. Mar.

17, 2020) (public interest favored denial of stay).  While Intervenors "clearly would prefer that the

Ninth Circuit have an opportunity to review its challenges [] before producing the discovery in

PETITIONER'S OPPOSITION TO MOTION TO STAY - 15

question, that preference does not implicate the public interest." *Nikon Corp. v. GlobalFoundries U.S., Inc.*, No. 17-MC-80071-BLF, 2017 WL 4865549, at *3 (N.D. Cal. Oct. 26, 2017).

## CONCLUSION

For these reasons, Petitioner respectfully requests that the Court deny both the Motion for a Stay, both pending the Ninth Circuit's review of the second Motion for a Stay and for a Stay Pending Appeal.


Dated:  August 9, 2024


By: *s/ Tara J. Plochocki*

Tara J. Plochocki, DCB #989404
Sequor Law P.A.
650 Massachusetts Avenue NW
Suite 600
Washington DC  20001
tplochocki@sequorlaw.com
*Counsel for Petitioner Novalpina Capital Partners I GP S.À.R.L.*

Jesse Mondry, OSB #192559
Harris Sliwoski LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harris-sliwoski.com

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 4967 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


PETITIONER'S OPPOSITION TO MOTION TO STAY - 16